Henry J. Moravec, Sr. and Vlasta Moravec v. Commissioner. Henry J. Moravec, Jr. and Marlene Moravec v. Commissioner.
Moravec v. Commissioner
Docket Nos. 6049-66, 6050-66, 3647-67, 3648-67.
United States Tax Court
T.C. Memo 1971-140; 1971 Tax Ct. Memo LEXIS 195; 30 T.C.M. (CCH) 601; T.C.M. (RIA) 71140; June 15, 1971, Filed *195 Arthur N. Nasser, for the petitioners. Nelson Shafer, for the respondent. 602 SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income taxes of petitioners Henry J. Moravec, Sr. and Vlasta Moravec for the calendar years 1962 and 1963 in the amounts of $57,750.24 and $145,145.36, respectively, and an addition to tax under section 6653(b), I.R.C. 1954, [1] for the calendar year 1963 in the amount of $72,572.68. He determined deficiencies in the income taxes of petitioners Henry J. Moravec, Jr. and Marlene Moravec for the calendar years 1962 and 1963 in the amounts of $51,885.81 and $138,474.81, respectively, and an addition to tax under section 6653(b) for the calendar year 1963 in the amount of $69,237.41. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision the following: (1) Whether each petitioner couple received capital gain in excess of the amount reported on their return in 1962 on the sale of a parcel of real property. (2) Whether Henry J. Moravec, Sr. and Henry J. Moravec, *196 Jr., each received $175,000 of income from an amount of $350,000 transferred to Henry J. Moravec, Jr., in the form of a loan and deposited in a joint checking account of these two petitioners. (3) Whether respondent properly determined an addition to tax for fraud against Henry J. Moravec, Jr., and Marlene Moravec for the year 1963. Findings of Fact Some of the facts have been stipulated and are found accordingly. Henry J. Moravec, Sr., and Vlasta Moravec, husband and wife, were residents of Illinois at the time their petitions in this case were filed. They filed joint Federal income tax returns for the calendar years 1962 and 1963 with the district director of internal revenue, Chicago, Illinois. Henry J. Moravec, Jr., and Marlene Moravec, husband and wife, who at the time their petitions in this case were filed, were residents of Wisconsin, filed their joint Federal income tax returns for the calendar years 1962 and 1963 with the district director of internal revenue, Chicago, Illinois. During the years 1962 and 1963 Henry J. Moravec, Sr. (hereinafter referred to as Moravec, Sr.) and Henry J. Moravec, Jr. (hereinafter referred to as petitioner) were partners in an insurance *197 agency with its principal office located in Riverside, Illinois. Both of the Moravecs were also employed during these years by Marshall Savings and Loan Association, a state-chartered savings and loan association with its principal office located in Riverside, Illinois, Moravec, Sr. as president and petitioner as vice president. Marshall Savings and Loan Association (hereinafter referred to as Marshall) was a member of the Federal Home Loan Bank during the years here in issue. In 1962 Moravec, Sr. and his wife and petitioner and his wife owned an interest in a parcel of property in Chicago, Illinois (hereinafter referred to as the College Avenue property). Each couple owned a one-third interest in this property. The title to the property was held in Trust No. 912, of which the Wheaton National Bank was trustee. The primary beneficiary of that trust was Edward Pocius (hereinafter referred to as Pocius). In 1962 petitioner negotiated a sale of the College Avenue property to Dan Serafine (hereinafter referred to as Serafine). Petitioner agreed to sell the property and Serafine agreed to buy it for $90,000. The agreement was oral and was not reduced to writing. Petitioner asked Pocius *198 to act as his agent or nominee in selling the College Avenue property to Serafine and Pocius agreed to do so. Serafine was interested in building a nursing home on the College Avenue property. However, after entering into the agreement with petitioner to buy the property and having feasibility studies made and preliminary plans drawn for the nursing home to be placed thereon, Serafine decided that it was not feasible to place a nursing home on the property. After determining that he could not use the property for a site for a nursing home, Serafine interested Robert Maag (hereinafter referred to as Maag), a builder with whom he had previous dealings, in 603 purchasing the property. Maag agreed to purchase the property for $135,000. Serafine arranged financing on the property for Maag. Maag paid the $135,000 to Pocius and Pocius distributed the proceeds of the sale of the property. Pocius distributed $45,513.68 to Serafine and $49,861.14 to petitioner for the interest of petitioner and his wife and Moravec, Sr. and his wife in the property less their allocable portion of certain encumbrances due on the property. Petitioner had no dealings with Maag with respect to the sale *199 or the financing of the College Avenue property and in fact did not know the deed to the property was actually drawn by the trustee to Maag and not Serafine, until his attention was drawn to this fact during an investigation of his income tax returns. Serafine reported the $45,513.68 which he received from the proceeds of the sale of the College Avenue property on his 1962 income tax return as ordinary income from commissions and return of expenses in connection with the College Avenue property. Maag, after acquiring the property, built some apartment houses on it. Serafine and petitioner became acquainted sometime in 1959 when someone brought Serafine to Marshall to secure a mortgage to finance the purchase of some real estate. At this same time Serafine became acquainted with Moravec, Sr. Serafine was a building contractor and mortgage broker. As a mortgage broker, he would attempt to place with various lending institutions mortgages for others who were purchasing property. During the years here in issue most of the mortgages which Serafine placed for other individuals were obtained from Marshall. However, in prior years and to some extent during the years here in issue Serafine *200 obtained loans from at least four other building and loan associations in the Chicago area. Sometime after 1959 Serafine acquired a shore cottage near where petitioner had a cottage and Serafine and petitioner became socially acquainted. Their social contacts were primarily during the summer months. During the years 1962 and 1963 Serafine negotiated with Marshall the financing of certain property for purchasers who were buying property from him. In certain instances, as hereinafter set out, Serafine sold the properties for several times the amount he had recently paid for them and in some instances was able to obtain loans from Marshall on the property on which the purchasers of the property were not personally liable. Marshall would charge a loan fee as well as receive interest upon these loans. In each instance Marshall had an appraisal report from an appraiser who was a member of the American Institute of Real Estate Appraisers (hereinafter referred to as MAI) and a recommendation from its loan department that the loan be made. Petitioner and Moravec, Sr., as members of the appraisal committee of Marshall along with one other person, approved these various loans. The details *201 of these transactions follow. The Westgate property In two separate transactions, one in 1958 and one in 1959, Serafine purchased two adjoining lots, one containing approximately 4 acres, and the other approximately 6 acres, and placed the legal title to these lots in a trust known as Trust No. 9173 with the Exchange National Bank as trustee. At the time Serafine bought the two properties, they were zoned "residential." In August 1962 Serafine arranged to sell the properties to Maag for $300,000 and $404,800, respectively. Maag intended to erect apartments on the properties. He knew at the time that the properties had not been zoned for apartments but he was assured by Serafine that such zoning would be obtained. Serafine arranged loans on the properties for Maag in the respective amounts of $300,000 and $404,800 with no personal liability assumed by Maag, purchase to be by an assignment of a beneficial interest in Trust No. 9173, which held the legal title to the properties. The loans which were obtained were designated as 1011-44 and 1011-45. Maag signed the loan applications. Attached to the applications was a report of Marshall's appraisal committee which stated that two *202 appraisals had been made on each lot, one at $88,000 per acre, and the other at $88,500 per acre, with the total value for the approximately 4-acre lot being $375,000 under one appraisal and $377,000 under the other, and the total value of the approximately 6-acre lot being $506,000 under one appraisal and $509,000 under the other. An appraisal report on these properties was submitted to Marshall by Eugene E. Mulhern & Co., Inc., of Chicago. This report was dated August 2, 1962 and covered both lots. The report showed that it was made at the request of Serafine. The 604 appraisal report stated that the highest and best use of the land would be to improve it with multiple unit dwellings and showed that the appraisal was made on that basis. The total appraised value of the two lots in this report was $881,000, the appraisal being on the basis of $88,000 per acre. The appraiser was shown as Eugene E. Mulhern, MAI. Mulhern died sometime prior to the trial of this case. The loan application on the property was submitted to Marshall's appraisal committee which recommended a loan of $300,000 for the lot of approximately 4 acres and $404,800 for the approximately 6-acre lot. These *203 loans were made by Marshall to Maag on the terms arranged by Serafine. The loan charges on these loans were as follows: $300,000
$404,800
loan
loan
Appraisers' fee
$ 350
$ 350
Closing and disbursement fee
1,500
2,000
Loan service charge
10,100
13,792
Credit report 50
50
$12,000
$16,192
The Appraisal Committee which on August 21, 1962, approved the loans was composed of Moravec, Sr., petitioner, and one other person. Two mortgage notes, dated August 21, 1962, and made payable to Marshall were signed by the trustee who held legal title to the property under Trust No. 9173, one in the amount of $300,000 and the other in the amount of $404,800. Each note had a maturity date 18 months from the day it was given and bore interest at the rate of 6 1/2 percent payable February 21, 1963, August 21, 1963, and February 21, 1964. Notes also signed by the trustee were given to Marshall for the amount of interest which would be due on the three interest dates. The mortgage which secured the notes in the case of each property contained a rider which stated that the date of actual commencement of construction of the improvement on the property must be *204 within 3 months from the date of the mortgage or the mortgage would be in default and the principal would become due and payable immediately. Under date of August 28, 1962, Serafine signed over his beneficial interest in Trust No. 9173 to Maag and Maag accepted the assignment. The proceeds of each loan (minus the loan charges) which were $288,000 and $388,608, respectively, were paid to the Exchange National Bank as trustee by Marshall's checks dated October 1, 1962. These checks were endorsed by the trustee and by Serafine and deposited by Serafine in his bank account at the First National Bank of Chicago. When Maag purchased the two lots from Serafine he expected to erect apartment buildings containing 256 units on the two lots and expected to begin construction within 90 to 120 days after purchase. He did not begin construction within 120 days since the change of zoning to permit building of the apartments on the land had not then been obtained. Apartment zoning for the land was never obtained. Maag made the first interest payments of $9,750 and $13,156, respectively, on or about February 21, 1963. The two remaining interest payments, each in the same amount as the first were *205 made by Serafine on or about March 5, 1964. No payments were ever made on the principal of the loan. On or about November 20, 1964, Joseph A. Nowicki made a fair market value appraisal of these two lots for a firm of certified public accountants who were looking into Marshall's affairs. On the basis that the lots would be used for residential purposes, he appraised the 4-acre lot at $40,000 and the 6-acre lot at $60,000. In his report he stated that the highest and best use of the land would be for multi-unit dwellings and in the appraisal report he considered both the zoning of the property at the time his appraisal was being made and the possibility of the property being rezoned for other uses. Lots 15 and 16 on Meadow Lane On December 8, 1962, Serafine entered into an agreement to purchase lot 15 on Meadow Lane for $30,000. Lot 15 was bordered by Meadow Lane on the north side and by the lots which Serafine had sold to Maag in 1962 on the south side. Lot 15 was improved by a one-story house and a two-car detached garage. On February 8, 1963, this lot was conveyed by deed in trust to the Exchange National Bank as trustee for Trust No. 15488. On February 10, 1963, Murray Furer *206 (hereinafter referred to as Furer) offered to purchase lot 15 from Serafine for $193,000. He was acquainted with Serafine and had from time to time had discussions with him with respect to the availability of land around the Chicago area for the construction of houses. Furer intended to construct townhouses on the 605 property and he "took it for granted" that it was either zoned for such construction or could be zoned for such construction. On or about April 9, 1963, Serafine entered into an agreement to purchase lot 16 on Meadow Lane for $40,000. Lot 16 is the lot adjoining lot 15 which Serafine had previously purchased. At the time Serafine agreed to purchase this lot it was improved by a two-story frame building which had formerly been a farmhouse. On May 14, 1963, a deed to this property was executed to the LaSalle National Bank as trustee under Trust No. 31026. On May 14, 1963, George J. Piraino (hereinafter referred to as Piraino) agreed to purchase lot 16 from Serafine. The purchase price of the lot was to be $194,000 and Piraino intended to build townhouses on the property. At the time Piraino agreed to purchase the property he was under the impression that the property *207 was zoned for townhouses. Furer and Piraino each applied to Marshall for a $200,000 loan, Furer for the purchase of lot 15 and Piraino for the purchase of lot 16. Each of these loan applications was filled out for the purchaser by Serafine but was signed by the prospective purchaser. Attached to each of the loan applications was a report of Marshall's appraisal committee which stated that each property had been appraised at a value of $257,000 by an MAI and at $257,500 and $257,400, respectively, by Marshall's loan department. Under date of May 10, 1963, A. LoMonaco and Associates, Inc., of Chicago, Illinois issued a valuation report on lot 15 and a separate report on lot 16. The report on lot 15 was issued to Furer and the one on lot 16 to Piraino. The two reports, except for the legal description of the property, are identical and the reports show that the two lots are situated side by side and contain exactly the same amount of land. The reports stated that the property being appraised was vacant land that was to be improved with 90 deluxe multiple apartment units and that such use was the highest and best use of the land. Each report listed three pieces of land which were stated *208 to be similar to the property being appraised and in the same location which had sold in 1963 at prices within the range of the amounts at which lots 15 and 16 were being valued. Each appraisal report was signed by Frank J. Sorrentino (MAI) as well as by the president of A. LoMonaco and Associates, Inc. Frank J. Sorrentino was expelled from the MAI because of these two appraisals and certain other appraisals. The appraisals made by A. LoMonaco and Associates, Inc., were submitted to Marshall. Marshall's appraisal committee consisting of Moravec, Sr., petitioner, and one other person approved a loan of $200,000 on each of lots 15 and 16. Marshall's files contain letters dated November 13, 1962, one addressed to Furer and one to Piraino, committing Marshall to loans of $200,000 on each lot 15 and 16. Neither Furer nor Piraino requested or received the loan commitment letter addressed to him. The terms of the loans were to be 18 months at 6 1/2 percent interest payable at 6-month intervals. Loan charges in each instance totaled $8,000, consisting of an appraisal and inspection fee of $100, closing and disbursement fee of $3,000, loan service charge of $4,850 and credit report of $50. *209 Furer and Piraino each executed a mortgage dated May 23, 1963 to Marshall on the lot he was purchasing. Each mortgage was secured by a note in the amount of $200,000. Each of the mortgages contained the following provisions: The property secured by the within mortgage is presently being divided into 80 townhouse sites. That after said plat is submitted to us, as aforesaid, the Mortgagors shall be entitled to release from the Lien of this Mortgage, from time to time and prior to the due date hereof any townhouse site or sites upon payment to the Holder of the Note of the sum of FOUR THOUSAND AND NO/100 ($4,000.00) Dollars per townhouse site so released. Also, on May 23, 1963, Furer and Piraino each signed a note to Marshall in the amount of $200,000, each note to run for 18 months at 6 1/2 percent per annum, payable at 6-month intervals. Each note stated that it was secured by a mortgage bearing the same date and issued to Marshall. Furer and Piraino also each signed the three interest coupon notes attached to the principal note. By trustee deed dated May 22, 1963, Furer delivered title to lot 15 to the Exchange National Bank to be held in Trust No. 15488 and by trustee deed dated *210 May 22, 1963, Piraino delivered title to lot 16 to the LaSalle National Bank to be held in Trust No. 31026. By check dated May 24, 1963, Marshall paid to the Exchange National Bank, and by check of the same date paid to the LaSalle National Bank as trustee, $192,000 representing the proceeds of the loans on lots 15 and 16 after 606 deducting the $8,000 loan charges. Each of these checks was endorsed to Serafine and deposited by him on May 28, 1963, in his account at the First National Bank of Chicago. On May 28, 1963, Serafine paid to Enfield Realty a $10,000 commission on the sale of each lot 15 and lot 16. At the time they purchased the property Furer and Piraino had plans under way to commence construction of townhouses. Piraino like Furer, had assumed that the property was zoned for townhouses. After finding out that the property was not so zoned, Furer and Piraino filed a petition to have the property zoned for townhouses. Furer and Piraino by letters dated September 10, 1963, and December 6, 1963, authorized an attorney by the name of Allan Bloch to apply for rezoning of the property so that townhouses could be constructed thereon. A petition to have the property annexed *211 to the town of Mt. Prospect and rezoned for multi-dwellings was filed by Piraino and Furer on April 22, 1964. The efforts to have the property rezoned failed. Neither Furer nor Piraino made any payment of principal or interest on their loans. Serafine made the first 6-months interest payment on each of the loans on March 4, 1964. At the time Serafine made these interest payments he received a note from Piraino for the amount of the interest payment on the note with respect to lot 16. Piraino has not paid the note he gave to Serafine and neither he nor Furer has made any interest payment to Serafine or to Marshall. In May 1969 foreclosure proceedings were instituted under the mortgage given by Piraino on lot 16. In May 1964 Harold J. Rieger, MAI, made an appraisal of lots 15 and 16 for the Department of Financial Institutes of the State of Illinois. In this report the fair market value of the lots was determined on the basis of single house residential use although the report noted that there was presently pending an application for rezoning and stated that an apartment development was proposed for an adjoining property (the property involved in Serafine's 1962 sale to Maag). *212 In the middle and late 1950's when Marshall was a small organization, Moravec, Sr. and petitioner, before approving a loan on a property, personally inspected that property. However, during 1962 and 1963 Marshall had grown to such a size that it had a loan department and personnel from that department made inspections of the properties and recommendations with respect to loans, and Moravec, Sr., and petitioner did not personally inspect properties before approving purchase loans. The third member of the appraisal committee of Marshall during the years 1962 and 1963 was deceased at the time of the trial of this case. In September 1962 Moravec, Sr., and petitioner made an agreement to purchase 640 permanent reserved shares (stock) of Marshall. On or about September 17, 1962, they applied for a loan of $640,000 from the Chicago City National Bank and Trust Company, Chicago, Illinois to use for the purchase of this stock. The loan was granted and the shares were purchased by the Moravecs on or about September 21, 1962. This brought the total holdings of the Moravecs in Marshall to 643,109 shares which represented approximately 88 percent of the total shares outstanding. Wheeling property
*213 In the early part of 1963 Moravec, Sr. and petitioner had purchased parcels two and three of a 4-parcel tract known as the Wheeling property from Joe Serafine, a brother of Dan Serafine. The property consisted of 20 acres and the purchase price was $160,000. [2] On or about February 11, 1963, title to parcels two and three of the Wheeling property was transferred to Trusts Nos. 15497 and 15498 at the Exchange National Bank. The Moravecs and their respective wives were the beneficiaries of these trusts. On February 21, 1963, the Exchange National Bank as trustee for Trusts Nos. 15497 and 15498 applied at the direction of the Moravecs, for a 6 percent loan maturing in 18 months in the amount of $325,000 for each of the trusts from Beverly Savings and Loan Association which was formerly of Chicago. The loans sought by the trusts were approved by Beverly Savings and Loan Association and the net proceeds were paid through the Chicago Title and Trust Company as escrow agent to the Exchange National Bank. The net proceeds of each loan was $311,917.50, making a total for both loans of $623,835. The Exchange National Bank endorsed the checks received under these loans to the Moravecs 607 *214 and the Moravecs deposited these checks in their joint checking account at the First National Bank of Chicago. These deposits were made about March 15, 1963, and on April 1, 1963, the Moravecs paid $312,850 out of the joint account into which these deposits were made on their outstanding loan at the Chicago City Bank and Trust Company. Shortly after the payment had been made by the Moravecs on their loan at the Chicago City Bank and Trust Company, petitioner received a call from the president of the Beverly Savings and Loan Association requesting that the loans made to the trusts of which the Moravecs were beneficiaries be repaid as soon as possible. He stated to petitioner that State and Federal examiners were at the Beverly Savings and Loan Association and the loans that had been made to these trusts were causing him to have difficulties with the supervising authorities. At the time repayment of these loans was requested, petitioner and Moravec, Sr., had approximately $307,000 in their First National Bank of Chicago joint checking account and did not have sufficient funds available elsewhere to repay the loans to Beverly Savings and Loan Association. Petitioner got the impression *215 from his conversation with the president of the Beverly Savings and Loan Association that only the net proceeds of the loans needed to be repaid since the loans had been outstanding for such a short time. Shortly after receiving the call requesting repayment of the loans to Beverly Savings and Loan Association petitioner got in touch with Serafine and asked him if he knew anyone from whom he (petitioner) could borrow approximately $330,000. Serafine, over the years, had borrowed money from The ChicagoBusiness Finance Company (hereinafter referred to as CBF). After receiving petitioners' call Serafine got in touch with officers of CBF and asked them if they would make a loan to petitioner. He received the reply that CBF did not have funds available to make the loan. Serafine told petitioner of the result of his contact with CBF. A few weeks later petitioner asked Serafine to again find out if CBF would be in a position to lend him the money to repay the Beverly Savings and Loan Association. Serafine again contacted officers of CBF and he was again informed that CBF did not have funds *216 available to make the loan and would not have such funds for at least 3 to 4 months. Serafine discussed petitioner's problem with Allan Bloch who was his attorney. He told Bloch that he had been unable to arrange for petitioner to obtain a loan from CBF and was considering making a loan to petitioner himself. Allan Bloch suggested that if Serafine made a loan to petitioner, it would be preferable to have the collection of the note made by CBF. Bloch suggested that since petitioner and Serafine were friends, Serafine provide CBF with $300,000 to be loaned to petitioner and that if petitioner did not repay the loan when due collection of the loan be made by CBF. On May 28, 1963, Serafine transferred by cashier's check of the First National Bank $300,000 to CBF. This check was deposited by CBF in its account at the American National Bank and CBF had the American National Bank draw a cashier s check to petitioner in the amount of $300,000. An officer of CBF by the name of Jacobson handled the negotiations with Serafine with respect to the loan to petitioner. Before the time of the trial of this case Jacobson had died. Shortly prior to actually receiving the $300,000 by the cashier's *217 check from the American National Bank, petitioner had discovered that Beverly Savings and Loan Association expected immediate repayment of the total $650,000. Because of this petitioner needed to borrow $50,000 in excess of the $300,000. Therefore, at the time the cashier's check for $300,000 was given to petitioners, Serafine drew his personal check of $50,000 to petitioner, and petitioner stated to Serafine that he would repay this $50,000 within 30 days. At the time the checks were delivered to him, petitioner executed a bearer note in the amount of $330,000 dated May 28, 1963, maturing in 6 months with 7 percent interest after date of maturity. Petitioner agreed to execute any further documents required for the additional $20,000 but no additional documents were required. The bearer note which was executed by petitioner was a confession of judgment note. Petitioner deposited the $300,000 cashier's check and the $50,000 check he received from Serafine in the joint account which he had with his father at the First National Bank of Chicago. On the same day these checks were deposited petitioner drew a check on the joint account for $650,000 and repaid Beverly Savings and Loan *218 Associatiion the $650,000 loan the trusts he received from Beverly. Petitioner and Moravec, Sr., never paid Joe Serafine the $160,000 for parcels two 608 and three of the Wheeling property and about one year after the date these properties were purchased by them from Joe Serafine the properties were reconveyed back to Joe Serafine. From May 28, 1963, until December 14, 1965, the bearer judgment note executed by petitioner was kept in the office of CBF in an envelope on which was written, "This note property of Dan Serafine for collection only." After Jacobson died, his associate in CBF, Robert Stein, began to liquidate the company. In November 1965 Stein wrote to Serafine and asked him to pick up the judgment note held by CBF for collection. In December 1965 Serafine had Stein deliver the note to his attorney, Allan Bloch. In January 1969 Bloch died and in January 1970 Serafine obtained the note from Bloch's partner. Prior to November 1965 Serafine had requested Jacobson to try to collect on the note. Serafine had been informed Jacobson had been unable to collect on the note, that he had attempted to have stock put up as collateral for the note but had received no reply from *219 petitioner in regard to his request for such collateral. In 1966 Serafine discussed personally with petitioner payment of the note. Petitioner stated that he had various legal problems and when these problems were resolved would be happy to talk with Serafine concerning repayment of the loan. Sometime prior to May 1964, the Department of Financial Institutions of the State of Illinois began an investigation of Marshall. By December 31, 1964, Marshall was under the control of the Department of Financial Institutions. Marshall was subsequently placed in receivership by the Department of Financial Institutions of the State of Illinois and the Federal Savings and Loan Insurance Corporation. Respondent in his notices of deficiency to the Moravecs, Sr. and to the Moravecs, Jr., for the year 1962, increased their income as reported on the basis that the selling price of the College Avenue property was $130,000 [3] instead of $90,000 as used by petitioners in computing the tax shown on their returns. In his notices of deficiency *220 to the Moravecs, Sr., and the Moravecs, Jr., for the calendar year 1963, respondent determined that Moravec, Sr., and Moravec, Jr., had each received $175,000 of income in 1963 representing one-half of the sum of $350,000, which respondent in his notices of deficiency stated was "obtained through collusive activity with third parties and deposited in May, 1963 by Dan Serafine, through a series of financial transactions, to a bank account held jointly by you * * * at the First National Bank of Chicago." Opinion The first issue in this case is whether Moravec, Sr., and petitioner sold the College Avenue property for $90,000 or $135,000. This question is entirely factual. The evidence shows that petitioner agreed to sell the property to Serafine for $90,000 and instructed Pocius to have the trust transfer the property to Serafine for that amount and distribute the net proceeds of the sale in accordance with the ownership of the various parties in the property. Serafine decided that he would have a feasibility study with respect to the use of the property for a nursing home made prior to having title transferred to him. When he agreed to purchase the property he intended to have a *221 nursing home built on it. As a result of the study, Serafine determined that it was not economically feasible to build a nursing home on the property. Having an agreement to buy the property, he contacted Maag to determine if Maag wished to buy the property. Maag agreed with Serafine to purchase the property for $135,000, and Serafine had Pocius transfer title to the property directly to Maag. Maag paid Pocius $135,000 for the property and Pocius gave Serafine a check for $45,513.68, $45,000 of which represented the difference between the $90,000 which Serafine had agreed to pay Moravec, Sr., and petitioner for the property and the $135,000 that Maag paid for the property. The balance of a little over $500 represented certain expenses Serafine had incurred in connection with the property. Pocius distributed to Moravec, Sr. and petitioner $49,861.14 which was the amount properly distributable to them on the basis of a selling price of $90,000 for the property. Petitioner testified that he did not know until informed to that effect by the revenue agent who was investigating his tax liability for 1962 that title to the property 609 had not been transferred to Serafine in return *222 for $90,000. The substance of Serafine's testimony is that he did not inform petitioner about the sale to Maag since he had an agreement with petitioner to buy the property for $90,000 and considered that any amount in excess of $90,000 paid by Maag for the property was his "commission." Serafine said he requested direct transfer of the property from Pocius to Maag. Pocius testified that he did not remember the details of the transaction except that he was convinced that he distributed the proceeds from the payment for the property in a proper manner. Serafine reported the $45,513.68 he received from Pocius as a commission and return of expenses. While technically the $45,513.68 [4] Serafine received was not a commission but to the extent of $45,000 was a profit from a sale of a contract to purchase land, in our view the substance of the transaction is the same as if Serafine had sold his contract to purchase the land for $90,000 to Maag in return for $45,000 and Maag had paid Pocius $90,000 from which approximately $50,000 was distributed to Moravec, Sr. and petitioner. *223 We hold that the substance of the transaction concerning the College Avenue property was a sale of this property by Moravec, Sr., and petitioner for $90,000 and respondent erred in increasing the sale price received by petitioners for this property to $130,000. The basic remaining issue in the case for the year 1963 is whether the $350,000 turned over to petitioner by Serafine in the form of a loan and deposited in the joint checking account of Moravec, Sr., and petitioner was in fact not a loan but rather a payment to the Moravecs which constituted taxable income. This question again is factual. It is respondent's position in this case that even though the transaction between Serafine and petitioner took the form of a loan, it was not in substance a loan but a payment by Serafine to the Moravecs because of loans which the Moravecs approved Marshall's making with respect to properties which were being sold by Serafine. This Court has had many cases dealing with whether a transaction which was in form a loan was in substance not a loan. Generally, these cases arise in connection with a transfer of funds in the form of a loan by a corporation to an officer or a stockholder. In *224 these cases we have set forth a number of criteria to be considered in determining whether a bona fide debtorcreditor relationship results from the transaction. See Irving D. Fisher, 54 T.C. 905, 909-910 (1970). The instant case, though quite different in its factual background from most cases involving the question of whether a transaction in the form of a loan is in substance a bona fide loan, does, just as those cases, present a purely factual question of the intent of the parties. If the parties intended a loan in that it was the intent of both the lender and the one to whom the money was lent that the money would be repaid, then the transaction is a bona fide loan and does not result in taxable income to the recipient of the money. In some cases the fact that a note is given has evidentiary value. In the instant case all the formalities of a loan were complied with. However, if as respondent contends, the loan was a subterfuge for a transfer of funds to pay for favors received, a meticulous compliance with formalities would be expected. Here, the parties concerned with the transaction testified that a bona fide loan was intended. In this case, as in other cases *225 involving the question of bona fides of a loan, this testimony is to be considered together with the other evidence of record to determine the real intent of the parties. From the facts in the instant case we have concluded that the $350,000 transferred from Serafine to petitioner was a bona fide loan. We have reached this conclusion on the inferences we have drawn from all the facts in the record. The money was transferred to petitioner by Serafine at a time when petitioner urgently needed funds to repay a loan which he had made from Beverly Savings and Loan Association. It was made after petitioner had unsuccessfully attempted to obtain a loan from a lending institution. The money was used to repay the loan petitioner and Moravec, Sr., had obtained from Beverly Savings and Loan Association. Moravec, Sr. and petitioner had recently purchased over 85 percent of Marshall's stock and it was this stock purchase which had originally necessitated their borrowing money. To accept respondent's argument, it would be necessary for us to conclude that petitioner, in connivance with Serafine, was deliberately "milking" Marshall of its assets. In our view the very fact that only 610 about *226 9 months prior to the transaction concerning the $350,000 petitioner and Moravec, Sr. had borrowed $640,000 from the Chicago City Bank and Trust Company to purchase approximately 85 percent of the stock of Marshall is very persuasive evidence of a lack of motive on their part to "milk" Marshall of nearly $1,000,000 in return for $350,000 to pay on the $640,000 cost of the stock. The interest of Moravec, Sr., and petitioner would be to keep Marshall a financially sound institution to protect the value of their stock. Other evidence tending to support the conclusion that petitioner was not conniving with Serafine to "milk" Marshall is the method whereby loans were made to various individuals who purchased property from Serafine. In each instance there was in Marshall's files an appraisal report by a MAI appraising the property for a sum well in excess of the amount for which a loan was made and a recommendation of the loan department of Marshall that the loan be made. In our view the facts here do not support a conclusion that petitioner and Moravec, Sr., knew that loans were being made on properties far in excess of the fair market value of the properties taken as security. We are *227 not called upon in this case to determine whether petitioner and Moravec, Sr., used due diligence in ascertaining all facts surrounding the loans approved for Marshall or how Serafine was able to obtain appraisals of MAI's to furnish to Marshall in support of loan applications. Marshall was compensated for the funds lent not only in interest but also in loan fees. If the loans had been adequately secured, they would have represented good investments for Marshall. From the facts here we conclude that when petitioner received the $350,000 from Serafine it was his intent to repay the sum when it became due and that the reason he did not repay it at that time was because of lack of available funds. The record shows some effort to collect but that no payment has been made. [5]
Shortly after payment on the note became due Marshall was under investigation by the Department of Financial Institutions of the State of Illinois and by the end of 1964 Marshall had been taken over by governmental agencies. Facts *228 which developed in 1964 may have caused petitioner to take a different view with respect to repayment of the note from that he had in 1963 when he received the $350,000. However, even if this were the case, it would not cause the transaction which took place in 1963 not to be a loan. We hold that respondent erred in increasing the income of each petitioner and Moravec, Sr., in the year 1963 by $175,000. Respondent contends that the fact that letters dated in November 1962 were in Marshall's files giving loan commitments to Furer and Piraino for lots 15 and 16 but that these letters were dated prior to the agreements of Furer and Piraino to buy the lots and they did not receive these letters indicates some connivance between petitioner and Serafine. We do not agree with respondent's contention. Serafine was a mortgage broker and in his business customarily negotiated loans for other persons. Also, Serafine would reasonably want loan commitments before acquiring the lots to sell to prospective customers. Respondent also contends that the fact that petitioner's bearer note was for $330,000 instead of either $300,000 or $350,000 is suspicious. Again we do not agree with respondent. *229 The $330,000 was the amount petitioner intended to borrow until about the time he received the funds. Had petitioner and Serafine been engaged in a scheme to cover up a payment by Serafine to petitioner they would very likely have carefully had the note redrawn to be in the exact amount of the funds transferred. It may be that Serafine was willing to make the loan to petitioner to preserve a readily available source for procuring loans on property but this does not mean that the advance was not a loan. The only argument respondent makes with respect to his determination of addition to tax for fraud against petitioner is the transaction regarding the $350,000 note. [6] We have concluded that the evidence as a whole establishes that the 1963 transaction between Serafine and petitioner constituted a loan. Since we have decided this issue for petitioner, it follows that respondent has failed to show that any of the underpayment in tax by petitioner in the year 1963 which may result because of certain 611 issues that have been disposed of between the parties was due to fraud. *230 Respondent argues that petitioner and Serafine, along with others were in collusion to obtain money from Marshall. Respondent has failed to show this fact by clear and convincing evidence. The evidence in this case, rather than showing any such collusion, tends to show that petitioner was not aware of loans being made on properties in excess of the fair market value of those properties. The interest payments on the loans obtained for the purchase of property by Maag in 1962 were made in full, the last such payment being made in February 1964. The principal of the loan on that property did not become due until early 1964. Petitioner had no reason to be suspicious of loans made to purchasers of property from Serafine in May 1963 when the loans were made with respect to lots 15 and 16 on Meadow Lane. Serafine in his capacity as a mortgage broker had brought a number of customers to Marshall. Serafine had also obtained loans for his clients from a number of other lending institutions in the Chicago area. Until an investigation into Marshall's affairs in the spring of 1964 disclosed that it had made loans relying on valuations of properties by MAI's on a zonning basis which had not been *231 obtained for the properties, petitioner was unaware of Serafine's arranging for loans from Marshall on overvalued properties. The record in this case lacks any support for respondent's determination of fraud. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. The record is not clear whether this was the price for both properties or one property.↩
3. The facts at the trial showed that Maag paid $135,000 for the property. However, the sale price used by respondent in determining deficiencies was $130,000.↩
4. It is not clear why Serafine was entitled to $513.68 for expenses but apparently this amount was to be allowed as an adjustment to the $90,000 purchase price.↩
5. As petitioner points out, the Illinois statute of limitations on the $330,000 bearer note does not expire until 10 years after its due date. See Ill. Rev. Stat. ch. 83, sec. 17.↩
6. Respondent on brief conceded that he has not sustained his burden of proof with respect to fraud in the case of Moravec, Sr.↩